UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRADILLAS COURT REPORTERS, INC., <br> Plaintiff, <br> v. <br> CHERRY BEKAERT, LLP, et al., <br> Defendants. | Case No. 18-mc-80064-KAW <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS** <br><br> Re: Dkt. No. 1 |

Plaintiff Gradillas Court Reporters, Inc. filed a lawsuit against Defendants Cherry Bekaert, LLP and Sara Crabtree, alleging that it lost a bid for a government contract due to Defendants' failure to timely file Plaintiff's bid. (Plf.'s Mot. to Compel at 5, Dkt. No. 1.) On March 28, 2018, Plaintiff brought the instant motion to compel production of documents from third-party Behmke Reporting and Video Services, Inc. ("Behmke"), the company that won the government contract that Plaintiff tried to bid on. Upon consideration of the parties' filings, as well as the arguments presented at the May 3, 2018 hearing, and for the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiff's motion to compel, subject to a protective order.

## I. BACKGROUND

Plaintiff is a woman-owned court reporting service. (Plf.'s Mot. to Compel at 5.) Defendants have acted as Plaintiff's professional government contracts experts and consultants since 2013, and as Plaintiff's contract manager on government contracts since 2015. (*Id.*)

In February 2017, Plaintiff retained Defendants to prepare and submit a bid for a contract with the Securities and Exchange Commission ("SEC contract"). (Plf.'s Mot. to Compel at 5.) The SEC contract would only be awarded to a woman-owned small business, narrowing the qualified field. SEC contracts are best services contracts where price and other factors, including

experience, are taken into account. (*Id.*)

Although Plaintiff informed Defendants of the deadline for bid submission, Defendants submitted Plaintiff's bid after the deadline, causing it to be automatically rejected. (Plf.'s Mot. to Compel at 5.) On January 18, 2018, Behmke was awarded the SEC contract, and Behmke was given two purchase orders under the bid. (*Id.* at 5-6.) A third company, Free State Reporting, Inc., filed two protests of the award to Behmke. (*Id.* at 6.) While the first protest was dismissed, the two purchase orders were canceled pending resolution of the second protest. (*Id.*) The SEC contract itself has not been cancelled, although Behmke asserts there is currently no operative contract. (*Id.*; Behmke Opp'n at 3, Dkt. No. 6.)

Plaintiff then filed suit against Defendants, bringing causes of action for breach of contract and professional malpractice. (Plf.'s Mot. to Compel at 6.) Defendants have asserted that Plaintiff cannot prove that it would have been awarded the SEC contract, even if Defendants timely submitted Plaintiff's bid. (*Id.*) Plaintiff, in turn, has hired a government contract specialist, Andrea Wilson, who states: "To give [an] expert report on the likelihood that [Plaintiff's] bid would have been accepted over the bid submitted by Behmke if Defendants . . . had properly prepared and submitted the bid, the most straightforward method is to compare [Plaintiff's] and Behmke['s] bid documents and apply the factors that the SEC uses to make such awards." (Wilson Decl. ¶ 5, Dkt. No. 3.)

Plaintiff originally sought Behmke's bid documents from the SEC under the Freedom of Information Act ("FOIA"), but the SEC refused to provide the documents per a regulation prohibiting the disclosure of confidential business information obtained in the bidding process. (Plf.'s Mot. to Compel at 6.) Plaintiff then served a subpoena for production of documents on Behmke, seeking the following documents:

> 1. Behmke's Bid, including any and all attachments, cover documents, and accompanying communications.
>
> 2. Any and all communications between the SEC and Behmke concerning the Bid Solicitation or Behmke's Bid.
>
> 3. Behmke Contract Award documents, including any and all attachments, cover documents, and accompanying communications.

    4.    Any and all documents showing payments from the SEC for services under the Behmke Contract Award.

    5.    Documents demonstrating Behmke's status as a woman-owned business.

    6.    Documents for any and all Awards that Behmke competed for or been awarded by the SEC since 2012, including but not limited to the following: documents soliciting bids for the Award, documents indicating the date of the Award, documents listing the services to be provided under the Award, documents showing the monetary value of the Award, documents submitted by Behmke to the SEC for the purpose of obtaining the Award including pricing information and labor category level, documents showing that the Award was awarded to Behmke (or others), and documents or communications indicating whether or not Behmke successfully carried out the services under the Award.

    7.    Documents sufficient to show government contracts bids that Behmke has competed for since 2012, including demonstrating Behmke's record of competition against Gradillas Court Reporters, Inc. with the SEC and elsewhere and on what criteria Behmke won or lost.

(Smith Decl., Exh. E ("Subpoena"), Dkt. No. 4.)

Behmke objected to the subpoena, asserting that the requested documents contain trade secret and proprietary information. (Behmke Opp'n at 5.) Plaintiff proposed filing an "attorney's and expert's eyes only" protective order, so that confidential business information could not be reviewed by Plaintiff itself. (Plf.'s Mot. to Compel at 7.) The parties were ultimately unable to resolve the dispute, and Plaintiff filed the instant motion to compel. On April 11, 2018, Behmke filed its opposition. On April 18, 2018, Plaintiff filed its reply. (Plf.'s Reply, Dkt. No. 10.) On April 25, 2018, Behmke requested leave to file a sur-reply, which was opposed by Plaintiff. (Dkt. Nos. 12-16.) The Court granted Behmke leave to file the first two pages of its proposed sur-reply. (Dkt. No. 17.)

On April 30, 2018, the Court issued an order stating that it was "inclined to grant Plaintiff's motion to compel as to [Subpoena Categories] No. 1 . . . and 5." (Dkt. No. 18 at 1.) The Court asked that the parties prepare to respond to two questions, and that the parties meet and confer regarding a protective order to govern any production. (*Id.* at 2-3.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 45(d)(3)(B) permits a court to quash or modify a subpoena

3

if the subpoena requires "disclosing a trade secret or other confidential research, development, or commercial information . . . ." Fed. R. Civ. P. 45(d)(3)(B)(i). As an alternative to quashing or modifying the subpoena, the court may order production under specified conditions if the party seeking production "(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C). In determining whether there is a substantial need, "the district court's role in this inquiry is to balance the need for the trade secrets against the claim of injury resulting from disclosure." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D. Cal. 2006). Moreover, this "determination of substantial need is particularly important in the context of enforcing a subpoena when discovery of trade secret or confidential commercial information is sought from non-parties." *Id.*

### III. DISCUSSION

In the instant case, Behmke asserts that the documents being sought include confidential, trade secret business information, including pricing and procurement information. (Behmke Opp'n at 6.) Plaintiff, in turn, does not appear to seriously dispute that pricing information is a trade secret, although Plaintiff points out that Behmke does not point to any specific basis "to withhold any information relating to its bid other than specific pricing information, and such information should be produced." (Plf.'s Reply at 1.)[1] Thus, the primary issues are whether Plaintiff can show a substantial need for the documents being sought, and how to balance that need against Behmke's claimed injury resulting from disclosure.[2]

---

[1] Prior to the hearing, the Court requested that the parties prepare to address what other confidential or trade secret information Behmke was claiming to be in the bid and other requested documents. (Dkt. No. 18 at 2.) Behmke raised concerns regarding line item pricing, customer lists, and suppliers, which Plaintiff did not appear to object to. To the extent Plaintiff contends the entire bid is a trade secret, the Court finds that this likely requires a review of each type of trade secret information contained. At this point, however, Behmke provides insufficient information for the Court to find that the entire bid is trade secret. For purposes of this motion, however, the Court presumes that the entire bid is trade secret, although such a determination may be subject to future determinations with more specific information.

[2] Behmke does not appear to argue that the requirement "that the subpoenaed person will be reasonably compensated" will not be satisfied, and thus the Court does not address this prong.

4

### A. Substantial Need

In general, "information need not be dispositive of the entire issue disputed in the litigation in order to be discoverable by subpoena." *Gonzales*, 234 F.R.D. at 686. Plaintiff asserts that it has a substantial need for the documents sought because it has the burden of proving causation and damages on its lost profits claim by showing that its bid would have been accepted over the Behmke bid if Defendants had timely submitted the bid. (Plf.'s Mot. to Compel at 10.) Plaintiff points to the declaration by its expert, Ms. Wilson, which states that "the most straightforward method" to make this determination would be to compare Plaintiff's and Behmke's bids and apply the factors used by the SEC to make such awards. (Wilson Decl. ¶ 5.) Ms. Wilson also states that she wants to review the documents regarding Behmke's past government work to evaluate Behmke's eligibility for the SEC contract, as compared to Plaintiff. (*Id.*)

As an initial matter, the Court finds that Plaintiff has not sufficiently explained why it needs Subpoena Category Nos. 2, 3, 4, and 7. These production requests are extremely broad, and unsupported by Ms. Wilson's declaration. For example, Subpoena Category No. 2 requests "[a]ny and all communications between the SEC and Behmke concerning the Bid Solicitation or Behmke's Bid." These communications could include discussions about events that took place *after* the bid award, such as resolution of the bid protests. While Plaintiff argued at the hearing that such communications could go to explaining why Behmke was qualified or why its bid was not flawed, this appears to be speculative. Moreover, such communications would not appear to even involve Behmke's past government work, which Ms. Wilson states is the reason she needs the remaining documents. The Court therefore finds that Plaintiff has not demonstrated a substantial need for these four categories.

With respect to Category No. 6, which concerns documents for any and all awards that Behmke competed for since 2012, the Court finds that Plaintiff is entitled to the documents soliciting bids for the Award, documents indicating the date of the Award, documents listing the services to be provided under the Award, documents showing the monetary value of the Award, and documents or communications indicating whether or not Behmke successfully carried out the services under the Award. Most of these documents appear to involve information created by the

SEC, not Behmke, and Behmke provides no explanation for why such documents would involve trade secrets. As for documents or communications indicating whether or not Behmke successfully carried out the services under the Award, these documents also do not appear to include any trade secret information, as it concerns Behmke's performance under contracts that have already been awarded. The Court, however, will not compel the discovery of "documents submitted by Behmke to the SEC for the purpose of obtaining the Award including pricing information and labor category level." Again, this request is insufficiently supported by Ms. Wilson's declaration, which states that the most straightforward way of determining liability is by comparing the actual bid documents. It is not clear why the bid documents are therefore not sufficient; to the extent Ms. Wilson states that she would like to compare Behmke's past government work to evaluate Behmke's eligibility, it would seem such information would be contained within the bid itself.

As to Category Nos. 1 and 5, the Court finds that Plaintiff has established a substantial need for these documents. As Ms. Wilson states, Category No. 1, or Behmke's bid, is necessary to determine liability, *i.e.*, whether Plaintiff would have been awarded the bid over Behmke. Category No. 5, which requests documents demonstrating Behmke's status as a woman-owned business, also is necessary to determining eligibility, as the SEC contract was only to be awarded to a woman-owned business.[3] Behmke makes three arguments for why the Court should find there is no substantial need for the documents, which the Court addresses in turn.

First, Behmke responds that any expert opinion would be "inherently speculative -- and, therefore, ultimately inadmissible . . . ." (Behmke Opp'n at 10.) Behmke further notes that any expert opinion "would become even more speculative in that the competitive bids were to be evaluated by the SEC not just on price, but also on more subjective criteria, including experience and expertise." (*Id.*) The Court disagrees. As an initial matter, as Plaintiff correctly points out, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). More importantly, even if admissibility was the

---

[3] It is also not clear to the Court why such information would be trade secret to begin with.

6

determinative factor, Behmke's assertion that the expert opinion would be "inherently speculative" is conclusory, and it is not clear how the Court can assume that the expert opinion would be inadmissible. Behmke does not, for example, suggest that Ms. Wilson is unqualified or that her methodology is problematic, or that expert opinions are not typically used in such cases. While Behmke argues that the SEC evaluates the bids on factors other than price, Behmke does not show that Ms. Wilson would have based her expert opinion solely on price; indeed, Ms. Wilson acknowledges that there is more than one factor reviewed by the SEC, and explains that she needs documents related to past government work to evaluate relative eligibility. (*See* Wilson Decl. ¶ 5.) In short, Behmke's assertion that the expert opinion will ultimately be inadmissible is itself speculative, and is alone insufficient to show that Ms. Wilson's opinion would likely be excluded. Thus, Behmke cannot show that the information Ms. Wilson seeks is not discoverable based solely on its conclusion that Ms. Wilson's opinion would never be admitted.

Next, Behmke contends that "the subpoena assumes that the contract that is the subject of the Complaint is operative." (Behmke Opp'n at 10.) In support, Behmke points to the subpoena, which defines "Behmke Contract Award" as "the SEC contract awarded to [Behmke] on January 18, 2018, and published by the SEC on January 29, 2018, a copy of which is attached here as Exhibit 1." (*Id.*; Subpoena ¶ 4.) Again, the Court disagrees. The subpoena definition does not presume that the SEC contract is currently operative; it simply identifies the date it was awarded and its publication date, before attaching a copy of the contract. Behmke does not explain how this information requires a finding that the SEC contract is still operative.

Third, Behmke argues that there is no substantial need because Plaintiff can use other evidence to prove that it suffered lost profits from Defendant's actions, such as Plaintiff's own record of successful bids. (Behmke Opp'n at 11.) For example, with respect to determining the likelihood of whether Plaintiff would have won the SEC contract over Behmke, Behmke points to the complaint, which states: "SEC contracting officers had evaluated Plaintiff Gradillas' prior work and in writings stated that if they had the choice, they would award future contracts to Plaintiff Gradillas, based on prior performance." (Behmke Decl., Exh. 1 ("Compl."), Dkt. No. 7.) This allegation, however, does not appear to be specific to the SEC contract bid itself, but appears

7

to be general statements based on prior bids that Plaintiff had submitted to the SEC; it does not demonstrate that the SEC would have awarded the SEC contract to Plaintiff over Behmke in this specific instance. Similarly, Behmke contends that Ms. Wilson herself "impliedly acknowledge[d]" that the documents sought are not necessary because Ms. Wilson only states that "the most straightforward method" to opine on the likelihood that Plaintiff's bid would have been accepted over Behmke's is to compare the two companies' bids. (Behmke Opp'n at 12; *see also* Wilson Decl. ¶ 5.) The potential existence of other evidence, which may be less probative or reliable, does not automatically mean that Plaintiff lacks a substantial need for the information sought here, which goes directly to whether Plaintiff's bid might have been accepted over Behmke's.

Behmke also suggests that Plaintiff can use evidence such as Plaintiff's historical track record of winning bids to prove its lost profits. (Behmke Opp'n at 11.) Both cases cited by Behmke are limited to determining the *amount* of the lost profits. *See Denny Constr., Inc. v. City & Cty. of Denver*, 199 P.3d 742, 748 (Col. 2009) (explaining that historical records of profits and evidence of prior profitability can be used to compute the amount of lost profits); *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth*, 191 Cal. App. 4th 435, 472-76 (2010) (finding sufficient evidence to support $30 million damages award based on the developer's testimony about the value of the property and expected profits). Here, however, Plaintiff must not only establish the damages amount, but liability, *i.e.*, that Plaintiff was likely to have been awarded the SEC contract over Behmke in the first place. Thus, assuming that Plaintiff has other avenues for establishing the amount of its damages, Plaintiff still has a substantial need for the documents to determine that its damages were caused by Defendants' actions.

The Court therefore concludes that Plaintiff has established a substantial need for the documents sought.

### B. Burden to Behmke

Next, the Court must balance the need for the documents sought with Behmke's claim of injury resulting from disclosure. Behmke argues that it will suffer severe financial harm if required to give the bid documents to Plaintiff, as such information includes pricing information

8

that Plaintiff can then use to gain a competitive advantage when bidding on future contracts. (Behmke Opp'n at 12; *see also* Behmke Decl. ¶¶ 10-12 (discussing how Behmke considers its pricing information to be confidential trade secret, and the steps it takes to protect the information).)

Behmke relies heavily on *McDonnell Douglas Corp. v. National Aeronautics and Space Administration* to argue that production of its confidential information cannot be compelled because it is likely to cause substantial competitive harm to Behmke. (Behmke Opp'n at 13.) *McDonnell Douglas Corp.*, however, is not applicable in this case, as it did not consider the scope of discovery in litigation. Rather, *McDonnell Douglas Corp.* was a reverse Freedom of Information Act ("FOIA") case brought to prevent the defendant agency from releasing certain pricing information contained in a contract between the plaintiff and the defendant agency. 180 F.3d 303, 304 (D.C. Cir. 1999). Thus, the Circuit Court was considering the applicability of FOIA Exemption 4, which "provides that an agency is not obliged to disclose information consisting of 'trade secrets and commercial or financial information obtained from a person and privileged or confidential.'" *Id.* (quoting 5 U.S.C. § 552(b)(4).) The Circuit Court found that while Exemption 4 did not prohibit the agency from disclosing such information, Exemption 4 was at least coextensive with the Trade Secrets Act, which would preclude the government from releasing such information. *Id.* The Trade Secrets Act, however, is limited to preventing the *government* from disclosing confidential information; it does not apply to all discovery generally, and Behmke does not explain why the Trade Secrets Act would apply to it either. Thus, *McDonnell Douglas Corp.* has no bearing on the instant case.

Instead, the Ninth Circuit has recognized that "[u]nder federal law, there is no absolute privilege for trade secrets; instead, courts weigh the claim to privacy against the need for disclosure in each case, and district courts can enter protective orders allowing discovery but limiting the use of the discovered documents." *Pasadena Oil & Gas Wyoming LLC v. Mont. Oil Props. Inc.*, 320 Fed. Appx. 675, 677 (9th Cir. 2009); *see also Fed. Open Market Comm. of Fed. Reserve Sys. v. Merill*, 443 U.S. 340, 362 (1979) ("As with most evidentiary and discovery privileges recognized by law, there is no absolute privilege for trade secrets and similar

9

confidential information. The courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure") (internal quotations and citations omitted).[4] For example, in *Gonzales*, the government subpoenaed from Google and other search engines their search index and search queries entered by users. 234 F.R.D. at 678. Google challenged the subpoena, arguing that its search index and query log were confidential.[5] *Id.* at 684-85. The district court found that a narrowed request of the proprietary information still involved somewhat commercially sensitive information, but that the government had substantial need for this information given Google's market share in internet searches. *Id.* at 686. The district court balanced the harm to Google in the form of loss of trust by Google users based on the disclosure of user search queries with the benefit to the government, and required the disclosure of a sample of the search index. *Id.*

Here, as discussed above, Plaintiff has a substantial need for the documents at issue in order to demonstrate whether it would likely have been awarded the SEC contract over Behmke if Defendants had timely submitted Plaintiff's bid. Behmke, in turn, has demonstrated that it is at risk of significant financial harm if its confidential pricing information is revealed to Plaintiff, who has competed and will likely continue to compete with Behmke for future contracts.

To limit any harm to Behmke, Plaintiff argues that a protective order can address Behmke's concerns. (Plf.'s Mot. to Compel at 15; Plf.'s Reply at 12.) If the harm to Behmke is limited, then Plaintiff's substantial need would outweigh such limited harm. Specifically, Plaintiff has proposed a protective order that would limit disclosure of confidential information to the attorneys of record

---

[4] Behmke contends that *Pasadena Oil* is distinguishable because it did not involve a subpoena to a third party. (Behmke Opp'n at 13.) The Court finds this distinction unpersuasive, as the Ninth Circuit did not suggest that this rule was limited only to discovery between the parties. While the Court must take care in cases that involve the trade secrets or confidential information of non-parties, *see Gonzales*, 234 F.R.D. at 685, this does not mean that non-parties are immune from providing any discovery of trade secrets or confidential information.

[5] Behmke argues that *Gonzales* is distinguishable because it did not actually involve trade secret information. (Behmke Opp'n at 13.) There, the government significantly narrowed its production request, and the district court presumed that this "small sample of proprietary information[] may be somewhat commercially sensitive." *Gonzales*, 234 F.R.D. at 685. The district court, however, still applied the requirements of Federal Rule of Civil Procedure 45, determining whether there was a substantial need and then balancing that need against the risk of harm to Google. *Id.* at 685-86.

10

and expert, but not the parties themselves. (*See* Smith Decl., Exh. L ("Protective Ord.").)

Behmke, however, essentially argues that the protective order will never be sufficient to protect its trade secrets. (Behmke Opp'n at 14.)

The Court rejects Behmke's proposition that a protective order can never be sufficient to protect trade secrets. As stated in its prior order, it is a reality of litigation that confidential information may be used at a trial; the purpose of the protective order is thus to reduce or eliminate that risk of confidential information falling into the wrong hands. The cases cited by Behmke do not support its argument that a protective order can never be sufficient.[6] For example, in *Waymo LLC v. Uber Technologies, Inc.*, the district court denied the request for production under a protective order after finding that the defendants had failed to demonstrate a substantial need. Case No. 17-cv-939-WHA (JSC), 2017 U.S. Dist. LEXIS 105394, at *10-11 (N.D. Cal. July 7, 2017); *see also Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wisc. 1990) (denying request for production after finding that the records were not "essential to proof of damages as claimed by [the plaintiff]," and that "the harm of disclosure to [the third-party] is greater than the value to [the plaintiff"). In such situations, where there was no substantial need for the confidential information sought to begin with, the potential ineffectiveness of a protective order had more effect on the balancing required, requiring that the court not compel the information sought.

Notably, in *In re Vitamins Antitrust Litigation*, also cited by Behmke, the district court noted its concern of requiring the production of documents for a case in another district, which would affect the court's ability to enforce the protective order. 267 F. Supp. 2d 738, 742 (S.D. Ohio 2003). The district court ultimately denied the motion to compel because there was a pending motion to dismiss in the underlying case, which if granted would eliminate the need for the information sought. *Id.* at 742-43. In so deciding, however, the district court noted that if the motion to dismiss was not granted, the court would consider compelling production of the documents sought because while its concerns about the ability to enforce the protective order was

---

[6] Although these cases were contained in the portions of Behmke's sur-reply that the Court did not permit filed, Behmke then raised the *Lyft* case during the hearing.

11

a serious one, it "would not necessarily be independently dispositive . . . ." *Id.* at 743.

Here, unlike in *Waymo LLC* and *Litton Industries, Inc.*, Plaintiff does have a substantial need for the documents sought. Without the bid documents, Plaintiff would have significant difficulty proving an essential element of their case, namely that they would have won the SEC contract over Behmke. Thus, this is not a situation where the risk of harm to the third-party, even with a protective order, would necessarily have outweighed the substantial need because there was no substantial need to begin with. Moreover, as recognized by *In re Vitamins Antitrust Litigation*, concerns over the ability to enforce a protective order is not necessarily dispositive, particularly where there is a substantial need for the documents sought.

The Court also rejects Behmke's argument that any protective order would not be sufficient because there will always be "a risk that its highly confidential and trade secrets will be disclosed to its direct competitor." (Behmke Opp'n at 14-15.) In short, Behmke believes that because the parties will want to have input and hear the expert testimony, "[i]t is virtually inevitable, that [the parties will] challenge or violate the terms of the protective order if the Behmke Reporting material is ordered to be produced." (*Id.* at 15.) To the extent the parties seek to challenge whether the information sought can be protected under the protective order, the parties will be required to convince the court to grant it relief. As to Behmke's argument that the parties will inevitably violate the terms of the protective order, the Court declines to assume that the attorneys will violate a court order, exposing themselves to contempt of court and sanctions.

Thus, the Court finds that Plaintiff's substantial need for the documents sought to prove liability in this case outweigh Behmke's potential harm, subject to the issuance of a protective order, similar to the Northern District of California's "Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets." This order, which was drafted by this court, was designed with precisely the instant scenario in mind, to reduce the risk of exposing confidential information in ways that would harm the producing party.

Rather than issue the Model Protective Order, however, the Court will order that the parties again meet and confer to see if they could resolve their differences. At the hearing, both parties provided the Court with a proposed protective order; having reviewed them, the Court

finds both to be inadequate. For example, Plaintiff's proposed order cuts out the majority of the Model Protective Order's § 7.4, concerning the producing party's ability to approve or object to the disclosure of highly confidential information to an expert. It is also not clear that Plaintiff's proposal that a party give the producing party only one day's notice of the potential use of protected material at trial is adequate, particularly where Behmke is located in a different judicial district. Behmke's proposed order, meanwhile, would prohibit any challenge to its confidentiality designations, which is not proper. It is also not clear if Behmke's order would permit the disclosure of confidential information to Defendants in this case.

If, after meeting and conferring regarding these issues, the parties are still unable to resolve their differences, the Court will be inclined to simply issue the Model Protective Order.

### IV. CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion to compel Subpoena Categories Nos. 1 and 5, as well as No. 6 to the extent consistent with this order, subject to the issuance of a protective order. The parties are again ordered to meet and confer on a protective order; the parties are to submit a status report by **May 25, 2018**. If the parties are unable to agree on a protective order, the Court will likely issue the Model Protective Order, with the necessary changes and additions for trial procedures.

IT IS SO ORDERED.

Dated: May 14, 2018

KANDIS A. WESTMORE
United States Magistrate Judge